UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |

| | |
|---|---|
| Paul M. Cruz | N/A |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:** ORDER AND JUDGMENT GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 68]

## I. Introduction

On May 24, 2023, Defendants Lions Gate Entertainment Corporation ("Lionsgate"), Starz Entertainment, LLC ("Starz"), Chernin Entertainment, LLC, Katori Hall, Liz Garcia, and Patrik-Ian Polk (collectively, "Defendants") moved for summary judgment in the instant case. For the following reasons, the Court GRANTS Defendant's motion.

## II. Factual Background[1]

[1] All facts are undisputed unless otherwise stated and are derived from the parties' briefs and supporting materials. Nothing in this section should be construed as a factual finding; rather, this section is merely background information regarding the instant lawsuit. "To the extent certain facts or contentions are not mentioned in this Order, the Court has not found it necessary to consider them in reaching its decision." *Sarieddine v. Vaptio, Inc.*, 2021 WL 4731341, at *1 (C.D. Cal. June 15, 2021).

: 

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

**A. Overview and Procedural History**

Plaintiff Nicole Gilbert-Daniels ("Plaintiff") created a work entitled *Soul Kittens Cabaret* ("*SKC*"). As referred to in this order, *SKC* consists of three individually copyrighted works: a 2006 musical stage play script (Registration No. PAU002998885), a 2010 musical stage play script (Registration No. PAU003535055), and a 2014 motion picture (Registration No. PAU0001924906). Defs.' Response to Pl.'s Statement of Genuine Disputes of Material Fact ("DRPSGD") 1.

Defendants created and aired a television show entitled *P-Valley* ("*PV*"). Defendants allege that *PV* was based on Defendant Katori Hall's earlier stage play. Defs.' Mot. for Summ. J. ("MSJ") 1. Plaintiff believes that *PV* infringed on her *SKC* copyrights and filed suit against Defendants on January 12, 2022, in the United States District Court, Northern District of Georgia. Compl., ECF No. 6-1. On March 20, 2023, this case was transferred to this Court. ECF No. 34. On May 3, 2023, the Court ordered Defendants to refile their previous motion to dismiss as a motion for summary judgment; that motion had previously been denied as moot by the court in the Northern District of Georgia upon transferring the case. ECF No. 60. Defendants did so on May 24, 2023. ECF No. 68.

While that motion for summary judgment was under consideration by the Court, the parties filed several other motions. First, Defendants moved to strike an expert report submitted by Plaintiff evaluating the substantial similarity of the works in question. The Court heard oral arguments on this motion on September 18, 2023. The Court has granted that motion. ECF No. 132. At that same September 18, 2023, hearing, the Court heard from the parties on whether additional discovery was warranted on the question of what access Defendants may have had to Plaintiff's work. After reviewing the appropriate caselaw, the Court declined to allow further discovery at that time. ECF No. 115.

**B. Summary of *Soul Kittens Cabaret***

:

Initials of Preparer PMC

The Court has reviewed *SKC* and provides the following summary based upon that review.[2]

*SKC* is a musical stage play. Sims Decl., Ex. C (*SKC* Film), ECF No. 68-2. It takes place in the titular establishment, Soul Kitten's Cabaret,[3] located in Detroit, Michigan. *Id.* The cabaret is a nightclub owned by Tata Burlesque, who inherited the cabaret from an elderly lover.[4] Tata is most accurately described as a gay man.[5] While the scripts do contain some descriptions that suggest that Tata may not rigidly identify as a man (e.g., he is referred to as a "drag queen" in the 2006 script and as a "den mother" and "show hostess" in the 2010 script), the scripts themselves and the characters in the play consistently refer to Tata by masculine pronouns. Sims Decl., Ex. A (2006 Script) at 1, ECF No. 68-2; Sims Decl., Ex. B (2010 Script) at 4, ECF No. 68-2. The cabaret is depicted as clean, well-lit, and respectable.

The main plot of *SKC* is set into motion by the arrival of Brandy, an ingenue who comes to the cabaret in search of work. Sims Decl., Ex. C (*SKC* Film), VTS_01_1 at 01:35, ECF No. 68-2. She is familiar with the cabaret and awed and delighted to be in its presence; she dances and imagines herself as a performer there. *Id.* at 01:35–02:05. Tata observes Brandy dancing, surprises her, and requests that Brandy continue dancing for him. *Id.* at 02:38–03:10. He is impressed by her talents. *Id.* at 03:14. Brandy's dance is best described as suggestive, but not explicit. She performs while wearing a loose polka-dotted

[2] While the Court has reviewed both scripts as well as the filmed production, this summary is based on the filmed production. References to the scripts are cited accordingly.

[3] This name (punctuated in this way) is displayed on a pink neon sign in the center of the set in the motion picture. Sims Decl., Ex. C (*SKC* Film), ECF No. 68-2. However, both the 2006 script and the 2010 script refer to the establishment as "MODERN DAY KIT KAT CLUB" in addition to "THE SOUL KITTENS CABARET CLUB." Sims Decl., Ex. A (2006 Script) & Ex. B (2010 Script), ECF No. 68-2. Both scripts then reference "Soul Kitten's Cabaret" in a way that may be referring to either the fictional venue or to the work itself. *Id.*

[4] Both scripts refer to Tata's deceased lover as an elderly Jewish man named Mr. Rudder. *Id.* The film does not reference the religious background of Tata's deceased lover. Sims Decl., Ex. C (*SKC* Film), ECF No. 68-2.

[5] The parties dispute the proper way to describe Tata's sexual orientation/gender identity. *See* Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 12 (claiming that Tata uses she/her pronouns and quoting language describing Tata as drag queen, den mother, hostess, etc.), ECF No. 70; Defs.' Reply Mem. 8 (distinguishing homosexuality and gender fluidity), ECF No. 75. Characters in *SKC* refer to Tata with masculine pronouns.

dress that covers most of her body. *Id.* After the two introduce themselves, Tata immediately offers Brandy a job. *Id.* at 03:56.

Brandy is quickly taken under the wing of Bianca, one of the club's veteran performers. Sims Decl., Ex. C (*SKC* Film), VTS_01_2 at 10:23–12:25, ECF No. 68-2. Bianca invites Brandy to stay with her until she has more fully established a life in Detroit. *Id.* Holiday, another performer at the club, attempts to dissuade Brandy from accepting Bianca's offer. *Id.* She instead offers Brandy the option to stay with her. *Id.* After a disagreement between Bianca and Holiday, Brandy eventually decides to stay with Bianca. *Id.*

Meanwhile, Brandy also meets Mike. *Id.* at 21:39. Mike is a bartender working at the cabaret. He is dyslexic and insecure about his difficulty reading. Sims Decl., Ex. C (*SKC* Film), VTS_01_1 at 24:38, 26:03, ECF No. 68-2. In an early scene, Mike punches Frank Rudder, Jr., after Frank repeatedly insults Tata by mocking his sexuality and gender, as well as claiming that Tata seduced his father into giving him the cabaret by turning his father gay with witchcraft. *Id.* at 17:25–22:09. Brandy and Mike bond over the fact that they both lost a grandparent around the same time; their grandparents also shared similar philosophies about love. Sims Decl., Ex. C (*SKC* Film), VTS_01_02 at 22:15–27:15, ECF No. 68-2. Mike believes that Brandy matches the description of the woman that his grandmother predicted he would one day fall in love with. *Id.* at 24:38. He quickly falls in love with Brandy and sings a song expressing those feelings. *Id.* at 24:48–27:15. Brandy seems to reciprocate his feelings. *Id.*

Frank Rudder, Jr., is one of the main antagonists of the play. He bears considerable animus towards Tata because of Tata's relationship with Frank's deceased father. Sims Decl., Ex. C (*SKC* Film), VTS_01_1 at 17:25–22:09, ECF No. 68-2. Frank believes that the cabaret should have been left to him in his father's will, but that Tata used witchcraft to seduce his father into giving the cabaret to Tata. *Id.* The will specified that Tata would remain owner of the cabaret so long as the three Soul Kitten commandments are not violated. *Id.* at 19:40. Accordingly, Frank sets out to ensure the commandments are violated so that he can take ownership of the cabaret. *Id.* at 22:48. The first Soul Kitten commandment is that employees of the cabaret cannot lay their hands on customers. *Id.* at 23:27–23:33. When Mike punches

Frank, he gives Frank his first victory. *Id.* at 22:15–23:12. According to Tata, Frank's goal in retaking ownership of the cabaret is to sell it to casino developers for a profit. *Id.* at 21:18.

Frank approaches Tyrone Love (a local "Tony Soprano") for information that he can use to get the cabaret shut down. Sims Decl., Ex. C (*SKC* Film), VTS_01_3 at 10:20, ECF No. 68-2. Frank agrees to pay two million dollars for that information. *Id.* at 11:55–12:20. Tyrone is the soon-to-be ex-husband of another performer at the cabaret, Carmen. Tyrone runs what one of the cabaret performers derides as a "shady . . . strip club down the street." *Id.* at 06:17. Tyrone takes an interest in Brandy, which leads Mike to bring a gun to the cabaret with which he can protect her. *Id.* at 05:00–05:15. After a dispute with Tata over the appropriate level of protectiveness with which to treat the performers, Mike quits. *Id.* at 06:40–07:44.

Throughout the play, there are recurring appearances of characters representing Good Conscience and Bad Conscience. Sims Decl., Ex. C (*SKC* Film), VTS_01_1 at 05:01–05:33, ECF No. 68-2. Bad Conscience delights in being around "bad things," such as drug addiction, insecurity, and infidelity; she is pleased to find a "jackpot" of these things at the cabaret. *Id.* However, she also detects innocence, kindness, love, faith, and trust. *Id.* at 05:38. Good Conscience arrives to challenge Bad Conscience and to nurture these qualities in the women who work at the cabaret. *Id.* at 06:14.

Under Bianca's mentorship, Brandy transforms herself. For example, Bianca instructs Brandy to wear more revealing clothing; she explains to Brandy that "revealing . . . is what we are going for. We are going for skin. That's how you make the tips, that's how you make the money . . . ." Sims Decl., Ex. C (*SKC* Film), VTS_01_2 at 34:36–34:48, ECF No. 68-2. In a dance scene which seems to occur outside of the main show's reality, Brandy appears alongside other scantily dressed performers and dances under the guidance of Bad Conscience. Sims Decl., Ex. C (*SKC* Film), VTS 01_3 at 00:15–04:07, ECF No. 68-2. Back in the story's main reality, Brandy returns to the cabaret in a form-fitting short black dress. *Id.* at 08:36. She begins to act far more assertively and aggressively (e.g., when Bianca tells the other performers that Brandy likes her mentorship, Brandy snaps back that she "can speak for [her]self"). *Id.* at 09:06. She declares that she is "a grown woman now, and life has never been better." *Id.* at 09:17. Brandy also

becomes standoffish with Mike, telling him to stop calling her "baby" and to start calling her by her name. *Id.* at 19:38. Mike tells Brandy that he doesn't even "know [her] anymore." *Id.* at 19:46. He then sings a song promising to treat her well and to be a supportive partner. *Id.* at 21:24–26:18. But Brandy rebuffs Mike, physically shoves him away, and mocks his inability to read. *Id.* at 26:19–26:38. She is particularly repulsed by Mike's tendency towards physical violence, embodied in his decision to punch Frank and his choice to bring a gun to the cabaret. *Id.* at 26:44; 28:05 (calling Mike a "thug"). By this point, Brandy's personality is radically different than it was at the time of her initial introduction.

Later, Brandy and Bianca have a falling out after Bianca gives Brandy the drug ecstasy to cheer her up, without explaining what the drug really is. *Id.* at 38:30–40:35. This falling out spreads into a rift between Bianca and the other performers. Sims Decl., Ex. C (*SKC* Film), VTS_01_4 00:00–05:45, ECF No. 68-2. The women share their struggles and reach a reconciliation once Brandy reminds them of the importance of faith. 05:45–08:00. Ronnie, another performer at the cabaret, explains that she wants to use the money she has made there to open a women's crisis center. The women share various ideas for services that the center could offer. *Id.* at 08:00–09:40.

While working that night, Brandy consumes several Jell-o shots, seemingly not realizing that they contain alcohol. *Id.* at 10:30–11:15. Eventually, Carmen intervenes and explains to the bartender that Brandy should not be drinking because she is underage. *Id.* Brandy quickly becomes intoxicated. *Id.* at 11:30. Shortly thereafter, Tata introduces Mike on stage; Mike explains that he has written a song for "someone special" while glancing in Brandy's direction. *Id.* at 13:28. Mike sings a love song, during which he removes his shirt. *Id.* at 14:59. Brandy begins flirting with Tyrone during Mike's performance. *Id.* at 15:15. Tyrone, Brandy, and Tyrone's right-hand man leave the cabaret together. *Id.* at 15:44.

In the alley behind the cabaret, Brandy decides to leave Tyrone behind, explaining that it's "not right" and that she is in love with Mike. *Id.* at 16:00–16:43. Tyrone becomes aggressive with Brandy, grabbing her and telling her that she needs to "finish what [she] started." *Id.* at 17:00. Mike intervenes, exiting the cabaret with a gun pointed at the head of Tyrone's right-hand man. *Id.* at 17:19–17:50. Tyrone likewise points a gun at Brandy. *Id.* Mike and Tyrone face off, each with a hostage of their own. *Id.*

Eventually, Holiday, Ronnie, and Carmen emerge and attempt to deescalate the situation. *Id.* at 18:08. Carmen persuades Tyrone to let Brandy go and takes his gun from his hand. *Id.* at 19:20. Mike releases his hostage as well. *Id.* at 19:30. After some conversation, Tyrone and Carmen reconcile their past marital strife. *Id.* at 21:25.

Frank Jr. arrives on the scene and attempts to convince Tyrone to perpetrate acts of violence to further discredit the cabaret, but Tyrone severs their business relationship. *Id.* at 22:10–22:33. Frank then reveals that his source of information within the cabaret is Bianca, with whom he is having an affair. *Id.* at 22:58–24:15. After exposing all of the women's secrets, Frank triumphantly storms away. *Id.* at 24:45–28:20.

Later, the cabaret appears to be on the cusp of permanently shutting down. *Id.* at 28:30. Tata explains that he decided not to challenge Frank's takeover attempt to prevent Frank from using his knowledge to further harm the performers. *Id.* at 29:16–29:28. Frank arrives at the cabaret to get Tata's signature on legal documents. *Id.* at 29:35. Bianca arrives shortly afterwards, cellphone in-hand, with Frank's wife on speakerphone. *Id.* at 30:25. Frank's wife, Tabitha, reveals herself to be Bianca's therapist. *Id.* at 30:30. Tabitha explains that she asked Bianca to track Frank's movements because she suspected him of cheating on her. *Id.* Bianca was acting undercover as a double agent, and her loyalty to the cabaret is revealed to be unblemished. *Id.* Tabitha explains that she has tracked down Frank's offshore bank accounts, with which he has been dodging certain reporting requirements. *Id.* at 30:46–31:00. Bianca uses that information to blackmail Frank into signing ownership of the cabaret over to Ronnie so that she can open her women's crisis center. *Id.* at 31:06–31:47. Tata then reveals that he, Mike, and Tyrone have partnered to turn Tyrone's strip club into an upscale cabaret. *Id.* at 34:06–34:22. Mike proposes marriage to Brandy, who excitedly accepts his offer. 34:45–35:00. The play ends with a song about sisterhood. *Id.* at 36:23.

### C. Summary of *P-Valley*

The Court has reviewed *PV* and provides the following summary based upon that review.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

*PV* is a television show; its first season consists of eight episodes, each approximately one hour in length. Sims Decl. ¶ 4, ECF No. 68-2. Therefore, its runtime is more than double the runtime of *SKC*.

*PV* is set in the fictional town of Chucalissa, Mississippi, the location of a strip club known as the Pynk. The Pynk is owned by Uncle Clifford, a gender-fluid person.[6] Uncle Clifford inherited the Pynk from her grandmother, who previously operated it as a "juke joint" and lounge; Clifford turned it into a strip club to increase profitability to pay off numerous loans that the lounge had taken out. Sims Decl., Ex. D, Episode 6 at 14:45–14:58, 28:51, ECF No. 68-2. The Pynk is dark, dirty, loud, and crowded.

The plot of *PV* is set in motion by the arrival of Haley, who reaches Chucalissa when she abandons a commercial bus that she is on after a hurricane has eliminated most of her belongings and killed her daughter. Sims Decl., Ex. D, Episode 1 at 00:00–2:29, ECF No. 68-2. She spots the Pynk's neon lights in the distance, gives herself a haircut in a gas station bathroom, and heads towards the Pynk. *Id.* at 02:29–03:00. Upon arriving there, she has insufficient money to enter the Pynk. *Id.* at 06:36–07:59. However, she spots a sign indicating that tonight the Pynk is hosting a "booty battle" open to amateurs with a fifty-dollar cash prize. *Id.* She decides to enter herself in the competition. *Id.* She chooses the stage name "Autumn Night" and wins the competition with an erotic performance; while she is dancing, Haley has flashbacks that reveal her to be the victim of domestic violence. *Id.* at 13:36–14:46. Upon receiving her winnings from Uncle Clifford, Haley asks her for a job. *Id.* at 15:03–16:15. Partially motivated by the impending retirement of her star dancer, Mercedes, Uncle Clifford offers Haley a position. *Id.* Mercedes is immediately hostile towards Haley. *Id.* at 16:26–16:41. Haley rents herself a cheap, unfurnished apartment with newspapers plastered over the windows; she gets drunk alone and accidentally destroys her cellphone, which appears to contain the last remaining photo Haley has of her daughter. 16:53–17:45.

[6] The parties do not dispute that Uncle Clifford is best described as non-binary or gender-fluid. *See* Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 12 ("In *P-Valley*, Uncle Clifford is the gender-fluid, African-American LGBTQ+ owner of the Pynk . . . ."), ECF No. 70; Defs.' Mot. for Summ J. 5 (describing the Pynk's owner as "a flamboyant and gender-fluid African-American named Uncle Clifford"), ECF No. 68. The characters on *PV* with the closest relationships to Uncle Clifford refer to her using feminine pronouns; the Court will do the same.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

In addition to Haley's journey, the other main plotline of *PV* is Uncle Clifford's attempt to save the Pynk from its precarious financial situation. A developer is attempting to buy up significant land in Chucalissa to open a new casino. Sims Decl., Ex. D, Episode 4 at 13:29–15:34, ECF No. 68-2. Mayor Ruffin, the mayor of Chucalissa, supports this plan for its potential to revitalize the local economy. *Id.* In particular, the developer needs the land that the Pynk sits on because it is waterfront property and Mississippi law requires that all casinos be built on the water. *Id.* Because the Pynk is already facing foreclosure, the developer is unwilling to attempt to buy the land from Uncle Clifford. Instead, Mayor Ruffin devises a special ordinance to accelerate the timeline on which the Pynk will be auctioned off. *Id.*

There are several other plotlines which play out over the course of *PV*'s first season.

Early on, Haley meets Andre, a (married) lawyer working for the casino developer, outside the Pynk. Sims Decl., Ex. D, Episode 1, 44:52–48:12, ECF No. 68-2. She spots Andre taking reconnaissance photos for his employer, but mistakenly thinks he is taking photos of her. *Id.* After a successful conversation, she gives Andre her real name. *Id.* Shortly thereafter, Uncle Clifford discovers that Haley is using a fake ID. She confiscates it and blackmails Haley into getting more information from Andre about the casino development. Sims Decl., Ex. D, Episode 2 at 49:13–51:54, ECF No. 68-2. Haley continues to get to know Andre and they develop a romantic relationship. Sims Decl., Ex. D, Episode 3 at 12:44–15:44, 35:15–38:12, ECF No. 68-2. Eventually, they return to Andre's hotel room. Once there, Haley invents a reason for Andre to leave and accesses his laptop. *Id.* at 38:12–39:04. She finds the casino development pitch, forwards it to Uncle Clifford, and ultimately leaves in a panic when she discovers that Andre had saved the photos which he took of her on the night they met. 41:33–42:38. Uncle Clifford confronts Andre using the information which Haley has provided her. *Id.* at 54:39–56:27. Haley and Andre's relationship is strained from that moment on, although they still care for one another. *See* Sims Decl., Ex. D, Episode 6 at 48:27–50:10 (Haley calling Andre to tell him that she is leaving Chucalissa and to tearfully say goodbye), ECF No. 68-2; Sims Decl., Ex. D, Episode 7 at 22:02–24:03 (Haley and Mercedes discussing Haley's farewell to Andre upon leaving Chucalissa), ECF No. 68-2.

:

Initials of Preparer PMC

Andre also attempts to navigate his desire to secure the casino development and his sense of obligation to the people of Chucalissa. He has a fraught relationship with Mayor Ruffin, who is also his godfather. As Uncle Clifford works on frustrating the casino development, Mayor Ruffin attributes these setbacks to Andre and promises to end their relationship. Sims Decl., Ex. D, Episode 7, 24:13–24:30, ECF No. 68-2. Andre also attempts to secure the sale of land from a trio of brothers known as the Kyles. Sims Decl., Ex. D, Episode 6, 23:31–28:01, ECF No. 68-2. Two of them (Wayne and Wyatt) are excited to sell the land at a hefty profit. However, their half-brother, Corbin, who is mixed race (unlike Wayne and Wyatt, who are white), wants to lease their land instead. *Id.* Motivated by greed and racial animus, Wayne and Wyatt force Corbin to sign a deed of sale at gunpoint. *Id.* Andre undoes that agreement and gets Corbin the lease agreement he wanted all along. *Id.* at 38:48–39:53

Uncle Clifford also develops a romantic relationship with a local rapper named Lil Murda. They initially keep their relationship a secret to avoid homophobic persecution and violence. Sims Decl., Ex. D, Episode 5 at 45:38–48:04, ECF No. 68-2. However, Lil Murda eventually tells Clifford that he wants to take her out on a public date. *Id.* The two begin to see each other more seriously. Lil Murda's star begins to rise when a video of another performer at the Pynk dancing to one of his song's goes viral online. Sims Decl., Ex. D, Episode 6 at 07:39–10:53, ECF No. 68-2. Lil Murda and that performer, Keyshawn, decide to pool their talents and boost one another's popularity with a fake relationship. *Id.* Keyshawn is repeatedly abused by her boyfriend, Derek. *See, e.g.*, Sims Decl., Ex. D, Episode 3 at 25:25–27:47 (Keyshawn unable to perform her dance routine due to bruised wrist), ECF No. 68-2. As Lil Murda and Keyshawn's fame continues to rise, Uncle Clifford schedules the Pynk's final night before foreclosure to be a joint performance entitled "Murda Night." That evening, a talent scout is in the audience. While Lil Murda and the scout speak, Uncle Clifford arrives and begin publicly touching Lil Murda. Lil Murda becomes embarrassed and insecure, and publicly rebukes Uncle Clifford. Sims Decl., Ex. D, Episode 8 at 19:33–20:32, ECF No. 68-2. Their relationship dissolves in the aftermath. *Id.* at 25:18–27:10.

Lastly, the Pynk's top dancer, Mercedes, plans to retire. Over her years dancing at the Pynk, she has accumulated enough money to purchase a dance studio with which she can train young girls in competitive cheerleading. Sims Decl., Ex. D, Episode 4 at 6:05–7:52 (Mercedes outlining her plan for her

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

dance gym), ECF No. 68-2. Her central motivation in doing so is to become closer to her daughter, Terricka, who is being raised by the widow of Terricka's father because Mercedes was unable to provide for her. Sims Decl., Ex. D, Episode 6 at 03:39–06:40 (Mercedes speaking to Terricka and to Shelle, the woman with custody of Terricka), ECF No. 68-2. Mercedes' mother strongly disapproves of her daughter's work as a stripper and shames her for it. *See, e.g.*, Sims Decl., Ex. D, Episode 1 at 51:58–54:11 (Mercedes' mother saying stripping is "blasphemous," calling Mercedes insulting names, and stating that Mercedes' work breaks her heart), ECF No. 68-2; *see also* Sims Decl., Ex. D, Episode 5 at 19:54–20:43 (referring to Uncle Clifford as Mercedes' "pimp"), ECF No. 68-2. Mercedes' plans are spoiled when her mother steals her money to purchase a church where she can lead a congregation. Sims Decl., Ex. D, Episode 4 at 40:49–42:14, ECF No. 68-2. When Mercedes discovers what her mother has done, she attacks her. The two women are arrested, and Mercedes misses the event that is supposed to be her last dance. Sims Decl., Ex. D, Episode 4 at 42:10–50:19, ECF No. 68-2. Mercedes recoups some of her lost funds by helping Haley launder money that Haley stole when she fled from her abusive ex-partner, Montavius. Sims Decl., Ex. D, Episode 6 at 01:20–02:23 (Haley and Mercedes using fake identities to receive wire transfers), ECF No. 68-2; Sims Decl., Ex. D, Episode 7 at 22:08–22:50 (Mercedes declining to be overpaid by Haley for her assistance with the money laundering), ECF No. 68-2. Mercedes and Haley bond during this process.

These various plots converge on "Murda Night," the Pynk's last night of operation prior to foreclosure. Keyshawn shares a romantic moment with Diamond, the Pynk's bouncer. Sims Decl., Ex. D, Episode 7 at 34:58–37:28, ECF No. 68-2. Lil Murda performs his new song, which is about Keyshawn, while she dances alongside him onstage. During his performance, he removes his jacket, leaving himself bare-chested, and does pushups. Sims Decl., Ex. D, Episode 8 at 05:30–06:58, 07:50–10:22, 34:28–34:49, ECF No. 68-2. Haley's ex-partner, Montavius, tracks her down and corners her in a private room at the Pynk, eager to get his stolen money back. *Id.* at 21:04–22:55. Mercedes realizes that Haley is in danger and attempts to rescue her by attacking Montavius. *Id.* at 23:10–23:45, 29:58–32:39, 33:20–34:27. However, Montavius avoids her attack and takes Mercedes hostage. *Id.* He threatens to kill her unless Haley brings him the money that she stole from him. *Id.* While Haley is gathering Montavius' money, Diamond confronts Derek over his abuse of Keyshawn. *Id.* at 35:15–35:54, 36:58–37:40. The two men

: 

Initials of Preparer PMC

fight over control of a gun which eventually goes off. *Id.* Patrons of the Pynk flee in the ensuing chaos. *Id.* Uncle Clifford, having realized that Haley and Mercedes are in danger, rushes to their aid. *Id.* at 37:48–38:12. Diamond gains the upper hand over Derek, but Keyshawn finds the gun that they were fighting over and points it at Diamond to force him to let Derek go. *Id.* at 38:15–39:15. Diamond hears a gunshot from the other room and rushes to the private room where Haley, Mercedes, Uncle Clifford, and Montavius are fighting. By the time he gets there, Montavius is dead, although the identity of his shooter is unclear. *Id.* at 39:48.

The next day, Uncle Clifford, her grandmother, and the Pynk's dancers attend the foreclosure auction dressed in mourning attire. *Id.* at 39:55–41:02, 42:32–43:59. Andre excitedly bids on the property, eager to secure the casino development. *Id.* at 43:55–44:12. However, Haley unexpectedly arrives and begins bidding; her bids quickly exceed Andre's authorized bid cap. 44:15–45:50. Andre attempts to get his supervisor on the phone to raise the bid cap, but ultimately decides to let Haley win the auction at the last second. *Id.* at 45:45. Mayor Ruffin challenges Haley to prove that she has the available funds to successfully purchase the property, and she dumps a duffel bag full of Montavius' money onto the floor. *Id.* at 45:55–46:10. Haley and Uncle Clifford return to the Pynk with Uncle Clifford's grandmother and Mercedes to begin plotting their next moves as business partners. *Id.* at 47:40–50:23.

## III. Legal Standard

### A. Motion for Summary Judgment

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of . . . [the factual record that] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies its initial burden, the non-moving party must demonstrate with admissible evidence that genuine issues of material fact exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

("When the moving party has carried its burden under Rule 56 . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). "On an issue as to which the nonmoving party will have the burden of proof . . . the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

A material fact for purposes of summary judgment is one that "might affect the outcome of the suit" under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although a court must draw all inferences from the facts in the non-movant's favor, *id.* at 255, when the non-moving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, [the] court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremukun*, 509 F.3d at 984.

**B. Copyright Infringement**

The Copyright Act of 1976 grants the owner of a copyright myriad exclusive rights. 17 U.S.C. § 106. In a copyright infringement case such as this one, alleging the unauthorized copying of one's work, there are two elements that a plaintiff must prove: (1) that the plaintiff owns a valid copyright in the work that has allegedly had its copyright infringed, and (2) that the defendant copied protected aspects of the plaintiff's work. *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). The second element, copying, has two sub-elements. First, the plaintiff must prove that the defendant actually copied their work. Second, the plaintiff must show that the works share substantial similarities, i.e., that unlawful appropriation took place.[7]

[7] Some courts have restated these various elements and sub-elements more simply as three elements which a plaintiff must prove. *E.g.*, *Gregorini v. Apple*, No. 2:20-cv-00406-SSS-JCx, 2022 U.S. Dist. LEXIS 183003, at *7 (C.D. Cal. Aug. 26, 2022) ("In order to prevail on a claim of copyright infringement, a plaintiff must demonstrate (1) 'ownership' (that she possesses a

:

Initials of Preparer PMC

The first sub-element to copying is *actual* copying. Actual copying must be shown to have taken place because independent creation is a complete defense to copyright infringement. *Id.* But proving actual copying is difficult; direct evidence is often unavailable. Plaintiffs can therefore prove actual copying circumstantially. To do so, a plaintiff must show that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying. *Id.* This analysis of probative similarities is distinct and not to be confused with substantial similarity analysis, which comes later. "This type of probative or striking similarity shows that the similarities between the two works are due to 'copying rather than . . . coincidence, independent creation, or prior common source." *Id.* (quoting *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010) (alteration in original)). "A finding of such similarity may be based on the overlap of unprotectable as well as protectable elements." *Id.* (citing *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116–17 (9th Cir. 2018).

The second sub-element to copying is substantial similarity, i.e., unlawful appropriation. *Id.* Substantial similarity is evaluated using a two-part test. *Id.* The first part of that test is the extrinsic component. Here, there is an evaluation of similarity between the defendant's work and *protectible* elements of the plaintiff's work. *Id.* (citing *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004)). This evaluation is differentiated from the probative similarities evaluation because it only considers the protectible elements of a plaintiff's work. In other words, it filters out the unprotectible elements and compares what remains. "'The extrinsic test is an objective test based on specific expressive elements: the test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works.'" *Benay v. Warner Bros. Ent., Inc.*, 607 F.3d 620, 624 (9th Cir. 2010) (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045). The second part of the substantial similarity test is intrinsic. *Skidmore*, 952 F.3d at 1064. (citing *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008)). The intrinsic test is a subjective comparison that focuses on whether

valid copyright in the work allegedly infringed upon); (2) 'copying' (that defendant copied her protected work); and (3) 'unlawful appropriation.'") (quoting *Skidmore*, 952 F.3d at 1064). For the sake of precision, the Court will use the formulation provided by the Ninth Circuit in *Skidmore*. However, this alternate conception is offered for its potential to elucidate the Court's analysis.

an ordinary, reasonable observer would find the works substantially similar in their total concept and feel. *Benay*, 607 F.3d at 624. Only the extrinsic test can be resolved by a court at the summary judgment stage. *DuMond v. Reilly*, No. CV 19-8922-GW-AGRx, 2021 U.S. Dist. LEXIS 37241, at *16 (C.D. Cal. Jan. 14, 2021). The intrinsic test, by contrast, must be decided by the trier of fact. *Benay*, 607 F.3d at 624. This does not mean, however, that summary judgment is not appropriate for copyright infringement claims.

While summary judgment is not highly favored in copyright cases, substantial similarity may often be decided as a matter of law. *Funky Films, Inc. v. Time Warner Ent. Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). The Ninth Circuit has frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity. *Id.* at 1078. "On a motion for summary judgment, we apply only the extrinsic test." *Benay*, 607 F.3d at 624. If a plaintiff cannot satisfy the extrinsic test, they cannot survive a motion for summary judgment. *Id.*

**i. The Extrinsic Test of Substantial Similarity**

As discussed above, the extrinsic test is the only appropriate analysis of substantial similarity which can be performed at the summary judgment stage. *See also Kouf v. Walt Disney Pictures & TV*, 16 F.3d 1042, 1045 (9th Cir. 1994) ("For summary judgment, only the extrinsic test is important. A plaintiff avoids summary judgment by satisfying the extrinsic test which makes similarity of the works a triable issue of fact."). "The extrinsic test is an objective test based on specific expressive elements: the test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in two works." *Id.* (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir.), cert. denied, 474 U.S. 826 (1985)). Put into practice, the extrinsic test consists of "a three-step analysis: (1) the plaintiff identifies similarities between the copyrighted work and the accused work; (2) of those similarities, the court disregards any that are based on unprotectable material or authorized use; and (3) the court must determine the scope of protection ('thick' or 'thin') to which the remainder is entitled 'as a whole.'" *Corbello v. Valli*, 974 F.3d 965, 974 (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994)). "The key question always is: Are the works substantially similar beyond the

:

Initials of Preparer PMC

fact that they depict the same idea?" *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 917 (9th Cir. 2010), *as amended on denial of reh'g* (Oct. 21, 2010).

## IV. Objections

Defendants make five broad objections to the contents of Plaintiff's Declaration, ECF No. 72. Each of these broad objections is an amalgamation of numerous particular objections. The Court will address them in turn.

### A. Objections to Testimony Regarding Defendants' Alleged Access to Plaintiff's Works

First, Defendants object to testimony in Plaintiff's Declaration related to the question of Defendants' access to her works. Objs. to Pl.'s Decl. 1, ECF No. 77. As the Court has already explained at length, *see* ECF No. 115, the question of access is irrelevant to a motion for summary judgment on the question of substantial similarity. Plaintiff's declaration does contain references to access, which is understandable because it was submitted before the Court issued its clarifying order. The Court has not considered access in its analysis of substantial similarity. For this reason, these objections are SUSTAINED.

### B. Objections Relating to Testimony Concerning the Contents of Plaintiff's and Defendants' Works

Defendants object to Plaintiff's description of her works as well as her description of Defendant's works on the grounds that the works themselves are the best evidence. Objs. to Pl.'s Decl. 1–3, ECF No. 77. They have cited several cases in which courts sustained best evidence rule objections to declarations that summarized works at issue in copyright infringement cases. However, those cases sustained similar objections when the original work had not been produced. *See Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986) ("The contents of Seiler's work are at issue. There can be no proof of 'substantial similarity' and thus of copyright infringement unless Seiler's works are juxtaposed with Lucas' and their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

contents compared. Since the contents are material and must be proved, Seiler must either produce the original or show that it is unavailable through no fault of his own."); *Richardson v. CBS Studios Inc.*, No. 12-CV-7925 ABC (SHx), 2013 U.S. Dist. LEXIS 200247, at *11 (C.D. Cal. Sept. 25, 2013) ("Rather than produce the actual ANTM episodes in which they claim their copyrights were infringed together with the copyrighted works, Plaintiffs' declarations simply recount their review of certain ANTM episodes . . . ."); *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 936 (9th Cir. 2002) ("We think that Fox's report of what he saw on the label in MTV's video library was inadmissible under the best evidence rule. Even assuming that the label's contents were not inadmissible hearsay, **7** LANS was required to produce the original label (or a duplicate, *see* Fed. R. Evid. 1003) or at least explain why it could not do so."). Here, the Court has access to, and has reviewed for itself, the contents of the works in question. For this reason, the Court OVERRULES Defendants' objections but notes that it has based its summaries and impressions on the works themselves rather than the parties' characterizations of the works.

### C. Objections to Plaintiff's Testimony Concerning Purported Similarities Between *SKC* and *PV*

Defendants next object to Plaintiff's testimony about the extent of the similarities between *SKC* and *PV*. Objs. to Pl.'s Decl. 3, ECF No. 77. Defendants base their objections on the fact that Plaintiff's testimony is "inadmissible opinion testimony by a lay witness." *Id.* Defendants concede that they "have not found a judicial decision in the Ninth Circuit addressing whether a plaintiff's testimony about alleged similarities between the plaintiff's and the defendant's works constitutes admissible opinion testimony by a lay witness." *Id.* at 3 n.2. The best that Defendants can offer is a citation to a footnote in *Walker v. Viacom Intern., Inc.*, No. C 06-4931 SI, 2008 U.S. Dist. LEXIS 38882, at *2, n.1 (N.D. Cal. May 13, 2008), in which that court sustained similar objections because statements in a declaration finding were "argumentative, lack[ed] foundation, and/or contain[ed] impermissible legal conclusions."

The Court is not persuaded by this citation. To oppose Defendants' motion for summary judgment, Plaintiff is required to identify similarities between *SKC* and *PV*. *See Frybarger v. IBM*, 812 F.2d 525, 528 (9th Cir. 1987) ("Because plaintiff bears the burden of proving that the works at issue are substantially

:

Initials of Preparer PMC

similar in a copyright infringement case, . . . summary judgment for defendant is appropriate when plaintiff fails to make a sufficient showing that the ideas and expressive elements of the works are substantially similar after defendant has properly identified in a motion for summary judgment that plaintiff has failed to do so." (internal citations, quotations, and alterations omitted)). There is no reason to hobble Plaintiff's ability to point out similarities between the works, which is required if Plaintiff is to survive summary judgment, on the grounds that a Court will be misled by improper opinion testimony. "Federal Rule of Civil Procedure 56, the rule governing summary judgment motions, provides that a court may consider a declaration so long as the declaration is made on personal knowledge, sets out facts that would be admissible in evidence, and shows that the declarant is competent to testify on the matters stated." *Datta v. Asset Recovery Solutions, LLC*, 191 F. Supp. 3d 1022, 1027 (N.D. Cal. 2016) (citing Fed. R. Civ. P. 56(c)(4)) (internal quotations and alterations omitted). Given Plaintiff's knowledge of her own work and her knowledge of Defendant's work, as well as the fact that both works are in evidence, the Court can properly evaluate the statements Plaintiff makes in her declaration and assign them the appropriate weight. These objections are therefore OVERRULED.

**D. Objections to Plaintiff's Testimony Concerning Copyright Infringement**

Defendants also object to statements in Plaintiff's Declaration that touch on Defendants' culpability regarding copyright infringement. Objs. to Pl.'s Decl. 3–4, ECF No. 77. Defendants concede that "obviously, there is little danger on the context of the MSJ of this hyperbolic testimony causing unfair prejudice, confusing the issues, or misleading the jury." *Id* at 3. Yet, they still object that the Court should exclude these statements under Rule 403 of the Federal Rules of Evidence. They once again cite *Walker*, 2008 U.S. Dist. LEXIS 38882 at *2, n.1, as support for this position. For the same reasons articulated above in Section IV-D, as well as the minimal risk that Defendants have conceded, the Court OVERRULES these objections.

**E. Objections to Plaintiff's Comparison Exhibits**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

Defendants object to exhibits 2, 3, and 4 of Plaintiff's Declaration on a variety of grounds, many of which are addressed in the Court's discussion of the previous objections. Objs. to Pl.'s Decl. 3–4, ECF No. 77. First, Defendants argue that these exhibits violate the best evidence rule as secondary writings and recordings. *Id.* at 4. As discussed in Section IV-B, these objections are misplaced because the Court has access to, and has reviewed, the works in question. It is unfair for Defendants to criticize Plaintiff for failing to cite to admissible evidence, *see* Defs.' Reply Mem. 1–3, while simultaneously objecting to Plaintiff's attempt to point to comparisons between the works.[8] Defendants also argue that Courts routinely disregard lists of similarities because they are inherently subjective and unreliable. Objs. to Pl.'s Decl. 5, ECF No. 77. That argument overstates the proposition. What is true is that courts treat such lists with caution. *See Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) ("While we have relied on such lists of similarities in the past for illustrative purposes, they are inherently subjective and unreliable. We are particularly cautious where, as here, the list emphasizes random similarities scattered throughout the works."). The Court has treated these lists with the requisite caution and finds that there is no reason to discard them in their entirety. These objections are therefore OVERRULED.

## V. Discussion

Before beginning its analysis of the alleged similarities between the works, the Court comments on some difficulties in its review that were created by Plaintiff's presentation. First, Plaintiff referenced numerous instances in *SKC* and *PV* without providing citations or time stamps which the Court could use to facilitate its review. More vexingly, Plaintiff also presented lists of similarities between *SKC* and *PV* that drew on multiple versions of *SKC* without distinguishing between them.[9] Courts generally find lists of random similarities between works to be subjective and unreliable. *Olson*, 855 F.2d at 1450. "Lists of similarities collected from multiple versions or drafts of a story are even more subjective and unreliable." *Miller v. Miramax Film Corp.*, No. CV 99-08526 DDP (AJWx), 2001 U.S. Dist. LEXIS 25967, *22 (C.D.

[8] The Court has noted the problems with Plaintiff's minimalistic citations, *see* Section V *infra*.

[9] Plaintiff has also inappropriately cited to a script for a proposed television pilot adaptation of *SKC*. That script is not in the record, and the Court has no evidence that that script was properly registered with the U.S. Copyright Office. The Court has not considered these references in its analysis.

:

Initials of Preparer PMC

Cal. Sept. 26, 2001). The Court invested significant time into working around these issues. And it has followed Plaintiff's lead in treating the filmed production of *SKC* as the central focus of comparison.

### A. Plot

"At a very high level of generality, the works do show a certain . . . similarity." *Berkic*, 761 F.2d at 1293. But "[n]o one can own the basic idea for a story. General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Id.* (citing *Litchfield v. Speilberg*, 736 F.2d 1352, 1357 (9th Cir. 1984)). Comparing plot under the extrinsic test for substantial similarity therefore requires focusing on "the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Id.* "A court must take care to inquire only whether the protectable elements, standing alone, are substantially similar. Copyright law only protects expression of ideas, not the ideas themselves. Familiar stock scenes and themes that are staples of literature are not protected. Scenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement. Historical facts are also unprotected by copyright law." *Benay*, 607 F.3d at 624–25 (internal citations, quotations, and alterations omitted).

#### i. Filtration of Unprotectible Plot Elements

First, the Court filters out unprotectible elements of the works.

The idea of a story about the performers at a cabaret or strip club cannot be protected. *See Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1020 (N.D. Cal. 2011) ("The most important similarity between the works involves an unprotectable element: the general idea of a futuristic conflict between man and machines, specifically computers and robots. That theme is a commonplace in science fiction."); *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123 (C.D. Cal. 2015) ("The court agrees that a 'walk of shame' is not itself protectable . . . ."); *Gable v. NBC*, 727 F. Supp. 2d 815, 839 (C.D. Cal. 2010) (noting that the "basic plot idea" of characters who "start as bad people, have a realization that their actions affect their future, and subsequently decide to lead better lives by making up for past wrongs" is "not copyrightable");

*Bethea v. Burnett*, No. CV 04-7690-JFW (PLAx), 2005 U.S. Dist. LEXIS 46944, at *40 (C.D. Cal. June 28, 2005) ("As an initial matter, Plaintiffs cannot copyright the idea of having a well-known business leader, or even more specifically Donald Trump, host a reality television program."). This idea—a work set in a strip club or cabaret—has been used in many works. *See, e.g.*, the musical *Cabaret* (1966); the movie *Showgirls* (1995); the movie *Hustlers* (2019); the movie *Striptease* (1996); the movie *Zola* (2020).

Further, the idea of a strip club or cabaret staffed primarily by Black dancers is similarly unprotectible. *See Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1065–66 (idea of a Black family moving into a predominantly white neighborhood and navigating the resulting racial dynamics cannot be protected); *Ricketts v. CBS Corps.*, 439 F. Supp. 3d 1199, 1212 (C.D. Cal. 2020) (rags to riches story of a talented Black football player from an impoverished area playing football in a more privileged area is well-trodden and not protectible), *reconsideration denied*, 19-CV-03895-DSF (MRWx), 2020 U.S. Dist. LEXIS 106262 (C.D. Cal. Mar. 19, 2020), *aff'd sub nom. Ricketts v. Makenna Prods., Inc.*, 20-CV-55912, 2022 U.S. App. LEXIS 9396 (9th Cir. Apr. 7, 2022).

The Court must also filter out unprotectible scenes-a-faire that flow from the idea of a work set in a cabaret or strip club. For example, the use of neon pink signage naturally derives from such a premise and is therefore not a protectible element. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 1, ECF No. 72-2.

#### ii. Comparison of Remaining Plot Elements Reveals No Substantial Similarity

Plaintiff describes the alleged plot similarities as follows: "Gender fluid owner of an erotic dance and performance venue inherited from loved ones. Both owners are working to save their venues from a takeover by a homophobic antagonist, who uses an 'inside man' to help acquire the land for Casino Developments." Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 5, ECF No. 72-2. This characterization does not hold up to closer scrutiny.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
|---|---|---|---|
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

First, Plaintiff mischaracterizes *SKC's* depiction of Tata Burlesque. Tata is a gay man, while Uncle Clifford is a non-binary person. While both are members of the LGBT community, those are fundamentally different identities.

Plaintiff also states that in both *SKC* and *PV*, "[t]he Homophobic Antagonist is setting up a chain of events that will lead to the current owner losing the venue." Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 5, ECF No. 72-2. The Plaintiff presents a photo of Mayor Ruffin alongside this claim, leading the Court to believe that Plaintiff is characterizing Mayor Ruffin as the homophobic antagonist. While Mayor Ruffin does display instances of homophobia, his central motivation is profit and political power. He seems to bear no animus towards Uncle Clifford rooted in Clifford's sexual orientation or gender identity. *See, e.g.*, Sims Decl., Ex. D, Episode 2 at 23:39–25:33 (conversation between Uncle Clifford and Mayor Ruffin in which Uncle Clifford displays far more hostility to Mayor Ruffin than vice versa), ECF No. 68-2. That motivation stands in marked contrast to the motivation of Frank in *SKC*, who is motivated by a deep and personal dislike of Tata for, as he believes, bewitching his father into being gay. While Frank does intend to profit off of his taking of the cabaret, he seems to be primarily motivated by his homophobic animus.

Additionally, that "chain of events" takes on a markedly different shape in the two works. In *SKC*, Frank attempts to manipulate Tata and the other members of the cabaret into violating the three Soul Kitten commandments, which would forfeit ownership of the cabaret. The situation in *PV* is far more mundane: the Pynk is facing foreclosure because it is severely behind on its loan payments. The antagonist's involvement in this situation is expediting the foreclosure timeline; there is no analogous situation in which Mayor Ruffin attempts to manipulate Uncle Clifford or the women of the Pynk into breaking a set of non-legal rules to trigger a consequence.

Plaintiff also points out that both Tata and Uncle Clifford "inherited the club from a loved on so it holds sentimental value." Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 5, ECF No. 72-2. But here again, the expression of this alleged similarity takes on very different forms. Tata inherited the cabaret from his deceased lover, who left it to Tata in his will. The cabaret was well established by that

:

Initials of Preparer PMC

point and had a set of commandments governing its operation. On the other hand, while Uncle Clifford did inherit the club from her grandmother, Clifford renamed it from Ernestine's to the Pynk and changed it from a juke joint into a strip club. She radically re-envisioned the property in a desperate attempt to save it, rather than preserving an existing entity.

The last remaining similarity is the prospect of a casino development. Defendants correctly outline the differences in how the works treat this subject:

> In *P-Valley* this is the major plot arc, with Uncle Clifford at risk of losing the property to foreclosure. A casino developer wants the Pynk, and the planned development would transform the entire landscape of the small, Mississippi Delta town. In contrast, in [*SKC*], the possibility of a casino buying the property is mentioned in passing only twice; no details are provided, no one representing the casino is portrayed as a character, and this supposed risk never materializes. Rather, in [*SKC*] the story's focus is on Frank's pursuit of his 'rightful inheritance' of the cabaret and whether Tata breaks the 'Soul Kitten commandments.'

Defs.' Mot. for Summ. J. 12–13 (citations omitted). In *SKC*, the development of a casino is mentioned very briefly and only in passing. What developers want to build (i.e., a casino) is unimportant—what really matters is that the land has a reason to be desirable. The casino is mentioned only in passing. By contrast, *PV* devotes a significant amount of attention to demonstrating that the fact that the project under development is a casino matters to the people of Chucalissa. For example, Uncle Clifford mobilizes religious objectors to gambling to protest the development. Sims Decl., Ex. D, Episode 7 at 09:12–10:52 (showing news coverage of Uncle Clifford and Mercedes' mother leading a religious protest of the casino), ECF No. 68-2. The works express the significance of the casino development differently; moreover, *SKC's* mention of a casino is extremely brief and therefore afforded very thin protection.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the plots of *SKC* and *PV*.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

**B. Themes**

"A work's theme is its overarching message." *Silas v. Home Box Off., Inc.*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), aff'd, 713 F. App'x 626 (9th Cir. 2018) (citing *Kouf*, 163 F.3d at 1045 (describing one work's theme as a celebration of family values and another work's theme as the triumph of good over evil); *Schkeiban v. Cameron*, No. CV 12-0636-R (MANx), 2012 U.S. Dist. LEXIS 145384, at *5 (describing a work's theme as a commentary on racism, genocide, imperialism, and environmentalism)). "Not all works have themes." *Id.* (citing *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988)). Works are less likely to have themes when they are "designed solely for entertainment and not to communicate some sort of moral lesson." *Id.* "[T]here is no protection for stock themes or themes that flow necessarily from a basic premise." *Id.* (citing *Olson*, 855 F.2d at 1451; *Cavalier v. Random House*, 297 F.3d 815, 823 (9th Cir. 2002)).

**i. Filtration of Unprotectible Themes**

Plaintiff characterizes the allegedly shared themes between the works as follows: "(i) addressing and challenging societal constructs of morality and 'good' and 'bad' people in a strip-club environment that has historically been deemed sinful/bad, and (ii) reflecting on the choices that the women dancers make as mothers, daughters, partners, and independent-people to navigate personal, societal, and religious expectations." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 6, ECF No. 70.

The second theme which Plaintiff has identified is not protectible. Reflecting on the choices made by women who work at a strip club is a theme that naturally flows from a work set in a strip club. As such, it is not entitled to protection. It is also too generic to be entitled to protection. *See Esplenade Prods. v. Walt Disney Co.*, No. CV 17-02185-MWF (JCx), 2017 U.S. Dist. LEXIS 217700 (C.D. Cal. Nov. 8, 2017) (themes about whether one can become anything they set out to be, whether one can overcome the prejudices inherent in a diverse society, and whether characters can achieve success while upholding moral and ethical behavior are "abstract, generic, and well-trodden, and thus unprotectable"); *see also Cavalier*,

:

Initials of Preparer PMC

297 F.3d at 828 ("The themes of teaching children to have confidence, to overcome their fears, and to try are not only too general to be protected but are also standard topics in children's literature.").

**ii. Comparison of Remaining Themes Reveals No Substantial Similarity**

While closely related to the central premise, challenging the application of a good/bad moral dichotomy to women working at a strip club or cabaret is not inherent to setting a work there. One could conceive of a work that took the theme in other directions, e.g., all women who work at strip clubs are morally bankrupt or all women who work at strip clubs are innocents who have fallen on hard times. However, the Court finds that *SKC* and *PV* express this theme differently.

*SKC*'s evaluation of its characters is significantly more rooted in religious faith. The characters of Good Conscience and Bad Conscience map onto the stock characters of an angel and a demon. Moreover, the women's shared faith is a key factor in Brandy's ability to eventually reconcile the various performers after their initial rift with Bianca. The Court also finds *SKC*'s exploration of this theme to be complicated by the notion that the cabaret's dancers need to be protected from the "shady . . . strip club" that Tyrone operates nearby. There is an implication there that, were the Soul Kittens to become strippers, they would be in greater danger of the sort of corruption that Bad Conscience celebrates.

*PV*, on the other hand, does not evaluate its characters through a religious lens. *See Gable*, 727 F. Supp. 2d at 838–39 (central themes of karma and redemption were expressed differently because one work used a religious lens and the other did not). The presence of religious judgment, as embodied in Mercedes' judgmental and cruel mother, is held up as a foil to expose hypocrisy. The worth and strength of *PV*'s characters comes not from their faith, but from their hard work and entrepreneurial acumen.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the themes of *SKC* and *PV*.

:

Initials of Preparer PMC

### C. Dialogue

"To support a claim of substantial similarity based on dialogue, the plaintiff must demonstrate 'extended similarity of dialogue.'" *Gable*, 727 F. Supp. 2d at 847 (quoting *Olson*, 855 F.2d at 1450). "Ordinary words and phrases are not entitled to copyright protection, nor are 'phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions.'" *Id.* (quoting *Narell v. Freeman*, 872 F.2d 907, 911–12 (9th Cir. 1989))."

#### i. No Dialogue Survives the Filtration Stage

The instances of alleged dialogue similarity that Plaintiff has cited are not extended and mostly pertain to common phrases or expressions. For example, Plaintiff points out that Brandy in *SKC* and Haley in *PV* introduce themselves according to the following convention: [First name]…[First name] [Last name]. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 15, ECF No. 72-2. Giving one's name in this way is ordinary, common, and not protectible under copyright law. Plaintiff also points to the following phrases spoken when Haley and Brandy are given new outfits: "Just the number for you" and "This one is for you." *Id.* These phrases are not very similar. *See Kouf*, 16 F.3d at 1046 (no similarity in dialogues where "the dialogues are similar in random words, at best"). To the extent that they do share some similarities, there are only so many ways to express that an outfit is for someone. This example is indicative of other similarities that Plaintiff has alleged.[10]

Plaintiff also points to instances in which Uncle Clifford and Tata Burlesque are both called a "freak." Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 19, ECF No. 72-2. As discussed

[10] Plaintiff provides many other examples of phrases that are meant to be similar, but really express similar ideas in different language. *See, e.g.*, (1) "No time like the present" and "You can start tomorrow if you want," (2) "Oh, you're so modest . . . You need to show more flesh if you are going to be in this business" and "What she has to be ashamed about," (3) "I better go take care of these boxes" and "I better go take care of my baby," (4) Bianca helped save the cabaret for "sisterhood and [because] she's a soul kitten at heart" and "I figure I owe you." These dialogue pairings do not show substantial similarity, nor are the phrases referenced protectible. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 15, 16, 18, & 23, ECF No. 72-2.

| | |
|---|---|
| | : |
| Initials of Preparer | PMC |

above, ordinary words and phrases are not entitled to copyright protection. Plaintiff makes a similar point with regards to the use of an offensive homophobic slur. The use of such a word is not protectible.[11]

Plaintiff's attempts to protect other common phrases cannot succeed for the same reason. For example, use of the phrase "last but not least" is not protectible. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 21, ECF No. 72-2.

Plaintiff also mischaracterizes the language used in each work's hostage scenario. When Montavius takes Mercedes hostage in *PV*, Haley tells him to "let her go." Sims Decl., Ex. D, Episode 8 at 31:53, ECF No. 68-2. When Carmen attempts to convince Tyrone to release Brandy, she says the following: "What you need to do is you need to let that girl go." Sims Decl., Ex. C (*SKC* Film), VTS_01_4 at 18:46, ECF No. 68-2. One cannot protect the use of the common phrase "let her go."

The Court finds that Plaintiff has not pointed to any specific lines of dialogue which have (1) allegedly been duplicated, and (2) survive the filtration of unprotectible elements. For these reasons, the Court finds that no rational jury could find substantial similarity between *SKC* and *PV* with regards to dialogue.

### D. Mood

When used to refer to artistic works in common parlance, 'mood' means "a prevailing attitude" or "a distinctive atmosphere or context." *Mood*, Merriam-Webster, https://www.merriam-webster.com/dictionary/mood (https://perma.cc/C5LE-CGG7). Caselaw often identifies mood based on holistic impressions that the works in question make. *See, e.g.*, *Rice v. Fox Broad. Co.*, 148 F. Supp. 2d 1029, 1058, *rev'd in part on other grounds*, 330 F.3d 1170 (identifying the mood of one work as "careful, meticulous" and the mood of another as "fairly sarcastic, even cynical); *Gable,* 727 F. Supp. 2d at 847 (characterizing the mood of one work as "light-hearted, silly" and the mood of another as "dramatic");

[11] The word is also used differently in each work. In *SKC*, Frank calls Tata that slur. In *PV*, a drunk patron calls Diamond (a straight man) that slur after Diamond throws him out of the club.

*Benay*, 607 F.3d at 628 (agreeing with a district court's assessment of the moods of works in question, with one mood being triumphant and the other being nostalgic and reflective).

### i. Filtration of Unprotectible Moods

Plaintiff touches on mood only briefly, describing the mood of both *SKC* and *PV* as "sexy, with a noir look & feel using the Lavender, Purples, and Mauve color pallet [*sic*]." Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 21, ECF No. 72-2. Plaintiff also points out that "[v]iolence, drug use, sexual abuse, and domestic abuse are prevalent in both works." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 17, ECF No. 70.

First, the Court does not think that mood properly encapsulates the use of a purple color palette.[12] Even if mood did properly encapsulate a color palette, the use of such colors flows naturally from setting a work in a strip club or cabaret and is therefore unprotectible. Accordingly, it is not afforded protection. Likewise, a "sexy" mood is natural and inherent to setting a work in a strip club or cabaret. As such, it is not protectible.

"Noir," on the other hand, is a mood which does not necessarily flow from a strip club or cabaret setting. As used in artistic contexts, 'noir' means "having a bleak and darkly cynical quality of the kind associated with hard-boiled crime fiction and film noir." *Noir*, Merriam-Webster, https://www.merriam-webster.com/dictionary/noir (https://perma.cc/Y76Q-PEHE). Because this mood does not inherently flow from the idea of a work set in a strip club, it is not filtered out at this stage.

### ii. Comparison of Remaining Moods Reveals No Substantial Similarity

Plaintiff mischaracterizes *SKC* in describing its mood as "noir." While it has its serious moments, *SKC* is ultimately light and uplifting. For example, it is frequently punctuated by characters singing

[12] However, a mood could be described using terms that evoke color, such as 'light,' 'dark,' or 'rosy.' The difference is that such terms are used to refer to attitudes.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

emotive ballads about love. It is fundamentally about the power of interpersonal connections, whether they be romantic, professional, or friendly.

*PV*, by contrast, is more appropriately described as noir. Its characters are cynical and traumatized. Those that choose to remain hopeful, like Mercedes, are ruthlessly undermined by harsh betrayals of those close to them. Political corruption and greed are recurring motifs.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the moods of *SKC* and *PV*.

**E. Setting**

Settings which "naturally and necessarily flow[] from the basic plot premise . . . constitute[] scenes-a-faire and cannot support a finding of substantial similarity." *Cavalier*, 297 F.3d at 824.

**i. The Settings of the Works Should Be Filtered Out**

Plaintiff offers two conceptualizations of the alleged similarities in settings between the two works. First, she notes that both are set in "erotic venues with scantily-clad, provocatively dressed, dancing women." The fact that both works frequently take place in strip clubs or cabarets must be filtered out as inherent to their premise; in fact, the categories merge if conceived of as such. *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000) ("Under the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea"). Plaintiff's second characterization more appropriately describes the expression of that setting: "chairs, tables, LED lit stairs to stage, archway with beaded curtains stage left, and the bar positioned stage left. Dancers work the stage while on stage with musical performers." However, these manifestations of expression are scenes-a-faire associated with a strip club or cabaret. One would expect to find chairs, tables, illuminated stairs, and beaded curtains in such a venue. As such, these elements are not entitled to protection.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

**ii. In the Alternative, Comparison of Remaining Setting Reveals No Substantial Similarity**

Even if the above settings were to survive the filtration stage, they are expressed differently. Plaintiff mischaracterizes the cabaret in *SKC*; it is well lit, clean, and spacious. Establishing shots of the Detroit skyline, which are interspersed among the main scenes of the play, show a bustling urban environment.

By contrast, the Pynk is dirty, crowded, loud, and dark. Scenes set in Chucalissa reveal the blighted landscape of a semi-rural area devastated by disinvestment.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the settings of *SKC* and *PV*.

**F. Pace**

One conception of pace is the amount of time that passes over the course of a work. "The timeline of a work is an important factor in determining whether pace is substantially similar." *Silas*, 201 F. Supp. 3d at 1181 (citing *Kouf*, 16 F.3d at 1046). "However, it is important to recognize that a pace that 'flows necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* at 1181–82 (quoting *Cavalier*, 297 F.3d at 823) (alterations omitted).

Pace can also refer to the speed at which a story is told. *See Olson*, 855 F.2d at 1451 ("Both works are quickly paced. However, these similarities are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity."); *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1177 (no protection for a fast but not frenetic pace).

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

**i. Pace Cannot Be Filtered Out**

Neither *SKC* nor *PV* specifies how much time elapses in their works. Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 17, ECF No. 70. The Court agrees with Plaintiff's assessment that both works likely span two to three months. *Id.* Nothing about setting a story in a strip club or cabaret necessitates having a plotline unfold over a two- or three-month period. Therefore, the Court does not filter out the pace as scenes-a-faire.

Plaintiff also alleges that both *SKC* and *PV* operate "at a similarly fast pace," referring to their speed of storytelling. The Court does not consider a fast pace to be inherent to a work set in a strip club or cabaret, so it will not filter out this alleged pace.

**ii. Comparison of Pace Reveals No Substantial Similarity**

As discussed above, *SKC* and *PV* take place over a similar time period of two- to-three-months. However, Plaintiff mischaracterizes the pace at which *SKC* is told. The play frequently slows down for musical interludes in which characters express their feelings. These ballads often last several minutes and significantly pause the unfurling of the plot. This factor is more significant in evaluating the pace of these works, especially because, as Plaintiff points out, "[*SKC*] is a stage-play and its entire narrative is compressed into a two-hour format, while [*PV*] is presented in eight, one-hour segments." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 17, ECF No. 70.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the paces of *SKC* and *PV*.

**G. Characters**

"Characters are not ordinarily entitled to copyright protection." *Blizzard Entm't v. Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1173 (N.D. Cal. 2015) (citing *Rice v. Fox Broad. Co.*, 330 F.3d

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

1170, 1175 (9th Cir. 2003)). To be entitled to copyright protection, a character must be sufficiently distinctive. *DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015) (noting that comic book characters are more likely to be sufficiently distinctive than literary characters because they are more likely to contain physical, conceptual, and expressive qualities). This requirement of sufficient distinctiveness is important because characters are often "only . . . chessman in the game of telling the story." *Warner Bros. Pictures v. CBS*, 216 F.2d 945, 950 (9th Cir. 1954) (citing *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2nd Cir. 1930)). Such 'chessmen' characters are not afforded copyright protection. *Id.*; *see also* Nichols, 45 F.2d at 121 ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."). "Characters that have received copyright protection have displayed consistent, widely identifiable traits." *Rice*, 330 F.3d at 1175 (citing cases establishing copyright protection for the following characters: Godzilla, James Bond, and Rocky Balboa). Put another way, when "the character really constitutes the story being told," such a character is entitled to protection. *Warner Bros.*, 216 F.2d at 950. Paraphrasing the *Nichols* court's characterization of its own rule, the Ninth Circuit wrote that "the line between infringement and non-infringement is indefinite and may seem arbitrary when drawn; nevertheless it must be drawn." *Warner Bros.*, 216 F.2d at 950. Stock characters are one of the origin points for the scenes-a-faire doctrine. *Apple Computer, Inc. v. Microsoft Corp.*, 799 F. Supp. 1006, 1021 (N.D. Cal. 1992).

But even characters that are not subject to copyright protection in their own right can still be evaluated for substantial similarity with characters in another work. *Rice*, 330 F.3d at 1176 ("Even though we conclude that the magician in Rice's work is not a separately protected character, the extrinsic test requires us to determine further whether the magicians in *The Mystery Magician* and the *Specials* are substantially similar.").

**i. Plaintiff Has Not Claimed That Her Characters Are Protected by Copyright Beyond the Substantial Similarity Analysis**

:

Initials of Preparer PMC

The parties have focused their briefings and arguments on the question of substantial similarities between pairs of characters. Accordingly, the Court will limit its analysis to the question of substantial similarity between characters in *SKC* and *PV*.

**ii. Analysis of Character Pairings**

Plaintiff has alleged similarities between three pairs of lead characters as well as three pairs of minor characters. The pairs of major characters are Brandy and Haley, Tata Burlesque and Uncle Clifford, and Bianca and Mercedes. The pairs of minor characters are Frank and Mayor Ruffin, Tyrone and Montavius, and Mike and Diamond. The Court will address each in turn.

**a. Brandy and Haley**

**I. Filtration of Unprotectible Elements**

First, Plaintiff alleges that Brandy and Haley are similar because they both arrive from nowhere carrying a vintage red suitcase. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 10, ECF No. 72-2. A character arriving from elsewhere is an extremely common stock element used in all manner of stories. The act of carrying a suitcase flows naturally from a character arriving from elsewhere.[13] *See Newt v. Twentieth Century Fox Film Corp.*, No. 15-CV-02778-CBM-JPRX, 2016 U.S. Dist. LEXIS 98308, at *13 (C.D. Cal. July 27, 2016) ("[T]he concept of characters with a troubled past is not protectable.") (citing *Gable*, 727 F. Supp. 2d at 844).

Plaintiff also alleges that these characters are both "beautiful." *Id.* If the idea of a beautiful lead could be copyrighted, Hollywood would have ground to a halt decades ago. *See Gallagher v. Lions Gate Entm't*, No. 2:15-cv-02739-ODW(Ex), 2015 U.S. Dist. LEXIS 122441, at *28 (C.D. Cal. Sept. 11, 2015)

[13] Even if the Court were not to filter this alleged similarity out, comparative analysis would reveal it to be unpersuasive. Even if it did not, Brandy's suitcase is a normal leather suitcase. Haley's, by contrast, is a water-damaged suitcase she fished out of flooded water after a hurricane.

("The similarity that they are both strong and look like movie stars is unavailing, for if *Trip* were to secure the copyright on strong and attractive males, there would be few works that do not infringe upon that common casting type. The fact that movie star Chris Hemsworth, the actor who plays Curt, 'looks like a movie star' does not suffice to establish substantial similarity."). Plaintiff develops this idea by pointing out that both Brandy and Haley have the "same physical features & skin tone." *Id.* Plaintiff cannot copyright the casting of an actress with a particular skin tone or with particular physical features.

### II. Comparison of Remaining Elements Reveals No Substantial Similarity

The remaining similarities addressed by Plaintiff are mischaracterizations of the works in question. Plaintiff claims that Brandy and Haley have similar personalities. In particular, Plaintiff alleges that they are both "modest, desperate for a job, and not the best dancers." Plaintiff mischaracterizes the works. In *SKC*, Brandy seeks out the Soul Kittens Cabaret because she has glamorous dreams of being a star. In *PV*, Haley finds herself working at the Pynk in a desperate attempt to make some money after fleeing domestic violence and a hurricane. *See Berkic*, 761 F.2d at 1293 (contrasting a character who is a dupe of a conspiracy and a character seeking to advance his career with a character who is seeking to avenge their friend's death). While Brandy may begin as "not the best dancer," Haley immediately establishes herself as a talented performer by winning the Pynk's amateur night "booty battle." Moreover, Brandy does not see a sign to audition; rather, Tata observes Brandy dancing for fun and offers her a job.

Plaintiff also alleges that Brandy and Haley share similar "pivotal moments." Here, Plaintiff cites several moments that appear to be blatant mischaracterizations. For example, Plaintiff claims that both Brandy and Haley arrive via public transportation. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 10, ECF No. 72-2. *SKC* does not reveal how Brandy arrives; Haley arrives at the Pynk via a combination of a coach bus and walking. Plaintiff also claims that both Brandy and Haley check into a seedy motel. *Id.* Brandy mentions having to pay for a hotel, but Bianca immediately invites Brandy to stay with her. Brandy accepts that offer. By contrast, Haley rents a seedy apartment. Plaintiff claims that both Brandy and Haley are told to change out of their "nerdy" clothes. *Id.* But only Brandy is wearing clothing

that could be described as such. Haley is told to change simply because she is not wearing an outfit that is appropriate for a performance at a strip club, i.e., it covers too much skin. Plaintiff states that both Brandy and Haley become the 'owner's pet.' *Id.* If Brandy becomes anyone's 'pet,' it would be Bianca, who takes her under her wing and molds her. Brandy and Tata have only minimal interaction once she gets a job at the cabaret. By contrast, Haley and Uncle Clifford have a tense relationship which involves Uncle Clifford blackmailing Haley into extracting useful information from Andre. Plaintiff also claims that both Brandy and Haley have a "secret life" back home that they haven't shared with their coworkers. Brandy has no such secret history. Haley, meanwhile, is on the run from an abusive ex-partner whom she attempted to kill and from whom she stole hundreds of thousands of dollars. Plaintiff argues that both Brandy and Haley are shy about their bodies and change in the bathroom despite working as erotic dancers. While Brandy is cautious about revealing too much skin, she is not shown changing. Haley, on the other hand, is shown changing her outfit in a closed bathroom stall so that she can check that her handgun is still in her bag and so that she can discretely down a bottle of alcohol. Lastly, Plaintiff alleges that both Brandy and Autumn are betrayed by their lovers, who are both married men. Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 14, ECF No. 70. However, Brandy is held hostage by Tyrone because, after flirting with him, she realizes she truly loves Mike and attempts to leave Tyrone's presence. Brandy and Tyrone are never lovers and do not know each other deeply. On the other hand, Haley is threatened by her ex-partner Montavius, from whom she stole hundreds of thousands of dollars. There is no evidence in *PV* that Montavius is married to someone else. Accordingly, none of these alleged similarities are present in the works.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the characters of Brandy and Haley.

**b. Tata Burlesque and Uncle Clifford**

Many of the alleged similarities between Tata Burlesque have already been discussed in Part IV-A-ii. The most salient points will be repeated below.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

### I. Filtration of Unprotectible Elements

The Court declines to filter out most of the alleged commonalities between Tata Burlesque and Uncle Clifford at this analytical stage. Defendants have cited to *Carlini v. Paramount Pictures Corp.*, No. 2:19-cv-08306-SB-RAP, 2021 U.S. Dist. LEXIS 46481, at *37 (C.D. Cal. Feb. 2, 2021), *aff'd* No. 21-55213, 2022 U.S. App. LEXIS 5480 (9th Cir. 2022), for the proposition that "sexual orientation or gender identity of a character is not protectable expression," but Defendants have overstated what that case says. *Carlini* noted that the trope of a "gay best friend" was common in the genre of romantic comedy and therefore not protectible, while also finding numerous differences between the allegedly similar gay characters in the works in question. 2021 U.S. Dist. LEXIS 46481 at *32, *37. It is not a common trope for strip clubs to be owned by LGBT individuals. Accordingly, the Court cannot say as a matter of law that a character possessing such traits cannot form the basis of protected expression under copyright law.

However, the Court will filter out Plaintiff's contention that both Tata and Clifford have tense relationships with their respective antagonists. Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 12, ECF No. 70. It is inherent and unprotectible that an antagonist *antagonizes* a protagonist.[14] That dynamic is not eligible for protection under copyright.

### II. Comparison of Remaining Elements Reveals No Substantial Similarity

The Court's decision not to filter out Tata Burlesque and Uncle Clifford's sexuality and gender identity does not establish substantial similarity; further analysis is required, and that analysis reveals key differences between the characters. As noted above, Tata is a gay man while Clifford is a gender-fluid

---

[14] Even if the Court did not filter out tension between Tata and Clifford and their respective antagonists, those relationships bear a number of differences that would defeat Plaintiff's claim of substantial similarity. Namely, the reasons for the animosity in each relationship are markedly different. Frank hates Tata because of Tata's sexual relationship with his father and because he feels that Tata inheriting the cabaret deprived him of his rightful inheritance. On the other hand, Mayor Ruffin's antagonism towards Clifford is mainly spurred by the mayor's desire to foreclose the Pynk so that casino developers can cheaply buy the land.

:

Initials of Preparer PMC

person. Those are different identities. Plaintiff claims that Tata dresses both masculine and feminine. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 11, ECF No. 72-2. But Tata exclusively wears male clothing.[15] Clifford, on the other hand, wears mainly feminine clothing and uses feminine pronouns. As discussed above, the circumstances by which they inherited their clubs are markedly different. Tata inherited the cabaret from his deceased lover, with strict instructions on how to run it in compliance with his lover's vision. Clifford inherited the Pynk from her grandmother and converted it from a juke joint into a strip club in an attempt to rescue it from precarious financial conditions. Lastly, Plaintiff claims that both Tata and Clifford have been in relationships with "down low men." *Id.* But Tata's relationship took place prior to the events of *SKC*. The play is silent on whether the relationship was public or not. By contrast, Clifford does secretly date Lil Murda and the development of that relationship is a significant plot on *PV*. Plaintiff also alleges that Tata and Clifford have similar personalities, i.e., that both take a no nonsense but fun-loving approach to running their venues. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 11, ECF No. 72-2. Once again, Plaintiff mischaracterizes the works to establish this alleged similarity. Tata is emotionally volatile and prone to extreme expressions of joy and despair; he seems to manage the cabaret according to his whims (e.g., firing and then rehiring a dancer in quick succession). Clifford, on the other hand, is calmer and shrewder. She blackmails Haley into providing her with information and enlists Mercedes' mother (despised by both Clifford and Mercedes) to mobilize protestors against the casino; she also frowns on displays of emotion and has a rule against crying in the Pynk (which she does, admittedly, violate on occasion—only to be reminded by her dancers of the rule's importance).

Plaintiff also argues that *SKC* featured a prominent LGBT character in 2004, at a time when such a theme was "virtually unheard-of." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 20–21, ECF No. 70. She then claims that the fact that "these two characters run so parallel across two decades of growing social acceptance lends strongly to the conclusion [that] these similarities are not coincidental." *Id.* First,

[15] Plaintiff includes a photo of the actor who plays Tata Burlesque wearing feminine clothing, but that image does not appear in *SKC*. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 11, ECF No. 72-2. Moreover, Plaintiff claims that this actor was cast because they are non-binary/gender fluid. That information is not properly considered when evaluating the similarities between the characters.

Plaintiff is mistaken that art dealing with LGBT themes was unheard of in 2004.[16] Second, Plaintiff's reference to 2004 is inappropriate, as the earliest work that the Court has been provided with is a 2006 script of *SKC*. Lastly, Plaintiff's point that such themes have become "rapidly more common nearly two decades later" undermines her own argument. As LGBT characters have become more prominent in American media, the fact that both Tata and Clifford are LGBT has become *less* probative of substantial similarity because the depiction of such identities is now afforded thinner protection.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the characters of Tata Burlesque and Uncle Clifford.

### c. Bianca and Mercedes

#### I. No Similarities Remain to Be Compared After the Filtration of Unprotectible Elements

Plaintiff alleges that Bianca and Mercedes are substantially similar. Specifically, she alleges that both women are veteran "Queen B[ees]" of their performance venues. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 12, ECF No. 72-2. A veteran performer at a strip club or cabaret is a stock character not entitled to protection. Plaintiff also alleges that both Mercedes and Bianca have troubled relationships with their mothers. *Id.* Strained parental relationships are stock plot elements not entitled to copyright protection.[17] Moreover, one might expect that stock plot to be even more common in

---

[16] *See, e.g.*, the play *Angels in America: A Gay Fantasia on National Themes* (1991) (examining LGBT life in America in the 1980s), the movie *Philadelphia* (1993) (story of a legal case related to workplace discrimination against a gay man with AIDS), the play *Rent* (1996) (musical about life in Manhattan's East Village with prominent LGBT characters), and the movie *The Birdcage* (1996) (gay cabaret owner and his drag queen partner agree to pretend to be a straight couple to appeal to socially conservative parents of son's fiancé).

[17] Even if such relationships were protectible, they are depicted radically differently in the works. For example, Mercedes' mother is a character depicted on *PV* with her own motivations and flaws. Bianca's mother, by contrast, is only discussed by Bianca; she never appears in the work. Moreover, Bianca's relationship with her mother is strained not because of Bianca's work, but because Bianca was conceived after her mother was raped by a white man. Her mother's pregnancy forced her mother to drop out of school and ruined her relationship with her family.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

works exploring the lives of women involved in careers that society traditionally stigmatizes. Plaintiff further alleges that both Bianca and Mercedes are the "[m]ain attraction, until the new and prettier mystery girl is hired." *Id.* The notion of a new arrival displacing an established character is, once again, a stock plot.[18] Lastly, Plaintiff alleges that both Bianca and Mercedes yearn for sisterhood and acceptance, but that "self[-]preservation is [their] motto." *Id.* A character's desire for acceptance amongst their peers is not protectible because it is a stock motivation.[19] Accordingly, the Court finds that none of Plaintiff's alleged similarities between Bianca and Mercedes are protected by copyright; there is nothing left for the Court to compare at the next analytical stage.

Because there are no protectible similarities left to compare, the Court finds that no reasonable jury could find substantial similarity between Bianca and Mercedes.

#### d. Frank and Mayor Ruffin

##### I. Filtration of Unprotectible Elements

Plaintiff characterizes Frank and Mayor Ruffin as homophobic antagonists who use an "inside man" to set up the club owner and ultimately fail to take over the property they seek. Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 13, ECF No. 72-2. Plaintiff also alleges that they both sport a goatee, wear a fedora, and carry a flask. These character descriptions are unprotectible stock

[18] Even if that plot were protectible, Plaintiff has mischaracterized the works to manufacture this similarity. While Haley's popularity does annoy Mercedes, Mercedes' status is not threatened by Haley because Mercedes has planned her own retirement. On the other hand, Bianca molds Brandy into someone who can eventually threaten her status; Brandy poses no threat on her own before Bianca reshapes her. Moreover, Brandy is not a "mystery girl." Her background and motivations are clearly established towards the start of the play.

[19] Even if that motivation were protectible, Plaintiff has mischaracterized the works to manufacture this similarity. While Bianca does yearn for the acceptance of her fellow performers, Mercedes already has that acceptance. Instead, she yearns to be a business owner, to reconnect with her daughter, and to be accepted by her mother. Moreover, neither character seems to be predominantly motivated by self-preservation. Bianca (misguidedly) risks her social clout to make Brandy feel better by giving her illegal drugs. Mercedes risks her life to rescue Haley from Montavius.

:

Initials of Preparer PMC

characteristics common to wealthy antagonists. The rest of the allegations survive the filtration stage and will be compared below.

**II. Comparison of Remaining Elements Reveals No Substantial Similarity**

As discussed *supra* in note 12, Frank and Mayor Ruffin have completely different motivations as antagonists. Frank hates Tata because of Tata's sexual relationship with his father and because he feels that Tata inheriting the cabaret deprived him of his rightful inheritance. On the other hand, Mayor Ruffin's antagonism towards Clifford is mainly spurred by the mayor's desire to foreclose the Pynk so that casino developers can cheaply buy the land.

Moreover, Plaintiff mischaracterizes the works to manufacture a similarity about an "inside man." While Frank gathers intelligence through Bianca, Mayor Ruffin has no inside source within the Pynk. If anything, the situation is reversed: Mayor Ruffin's secretary is a former dancer at the Pynk who provides information to Uncle Clifford (after being guilted into doing so).

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the characters of Frank and Mayor Ruffin.

**e. Tyrone and Montavius**

**I. Filtration of Unprotectible Elements**

Plaintiff alleges that both Tyrone and Montavius enter the "club and wreak[] havoc." Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 13, ECF No. 72-2. An antagonist wreaking havoc on a work's principal setting is an unprotectible stock plot element. Plaintiff also alleges that both antagonists have "a very dark background and [are] known to be someone to fear." *Id.* An antagonist having a dark

background and being dangerous is a stock plot element that cannot be protected.[20] Lastly, Plaintiff alleges that both antagonists hold a "co-worker" hostage in a chokehold with a weapon. *Id.* The Court filters out the allegation that both protagonists use a chokehold to hold people hostage under the merger doctrine, i.e., there are only so many ways that one can take an individual hostage. The event and its occurrence collapse into one thing. However, taking someone hostage does not naturally derive from the strip club setting. Accordingly, the Court will not filter this allegation out at this analytical stage.

### II. Comparison of Remaining Elements Reveals No Substantial Similarity

Both Tyrone and Montavius take someone hostage in the climax of their respective works. However, Plaintiff mischaracterizes who is taken hostage. In *SKC*, Brandy is taken hostage by Tyrone. Brandy is the protagonist of the work and therefore not a "co-worker." In *PV*, Mercedes is taken hostage by Montavius. Only Mercedes is a co-worker of either work's protagonist. Moreover, Tyrone takes Brandy hostage with a gun. Montavius takes Mercedes hostage with a broken bottle. Plaintiff characterizes these distinctions as akin to a "game of Clue: whether it was Colonel Mustard with the candlestick, Professor Plum with the lead pipe, or Mrs. Peacock with the rope, it all remains inescapably substantially similar." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 19–20, ECF No. 70. If this were the only distinction between the scenes, the Court might be persuaded by this (amusingly phrased) point. However, there are numerous other differences. First, *SKC* features a scene with *two* hostages: Brandy is held hostage by Tyrone and Tyrone's righthand man is held hostage by Mike. In *PV*, only Mercedes is taken hostage. Tyrone and Montavius also have different motivations for taking someone hostage. Tyrone takes Brandy hostage *after* Mike takes his friend hostage to secure Brandy's safety; his action is responsive. On the other hand, Montavius takes Mercedes hostage to force Haley to give him back the money she stole from

[20] Even if this stock element were not filtered out, Tyrone and Montavius have significantly different backgrounds. Tyrone is a local criminal who runs a strip club near the cabaret. Despite his scary appearance, Tata and Carmen both remember him as a young and sweet college student. Eventually, he and Carmen reconcile after Tyrone is redeemed. Montavius, by contrast, is a vicious abuser and the member of an organized crime syndicate. There is no redemption for Montavius; he is shot and killed in *PV*'s climax.

him. Lastly, Tyone willingly releases Brandy once Carmen appeals to their shared history. Montavius is unwilling to release Mercedes and is eventually shot and killed.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the characters of Tyrone and Montavius.

**f. Mike and Diamond**

**I. Filtration of Unprotectible Elements**

Plaintiff alleges that both Mike and Diamond protect "the club owner and dancers." Pl. Decl., Ex. 2 (Charts Summarizing Substantial Similarities) at 13, ECF No. 72-2. This description reflects a stock plot element that both men operate as security. There is no other way to have a character act as security. Accordingly, under the merger doctrine, this plot element is unprotectible.[21] Descriptions of these characters as "handsome, tall, athletic" are likewise unprotectible; that is the natural description one would expect of someone hired to work security. Plaintiff also alleges that both Mike and Diamond fall for a dancer who eventually turns on them after an incident with a gun. First, characters falling in love with one another is not protectible. Accordingly, a dancer falling in love with the security guard is a stock plot for a work set in a strip club.[22] However, both dancers souring on the security guard after a gun-related incident is not a plot inherent to the genre and will therefore not be filtered out at this stage of the analysis.

[21] Even if this plot element were protectible, both works depict how their characters act as security in extremely different ways. Mike uses force that deeply upsets Tata. Mike takes no formal steps to act as security; he is merely a reactive presence. Moreover, there is no indication that he has formal training. By contrast, Diamond is a veteran of the Iraq War with significant combat experience. He runs a professional security operation at the Pynk, screening all guests for weapons upon entry.

[22] Even if this plot element were protectible, both works depict how their love stories in completely different ways. Mike and Brandy's love story is one of the primary plots of *SKC*. They both believe in a fated love story and, at the end of the work, become engaged to marry. Moreover, they are the main characters of *SKC*. Diamond and Keyshawn are supporting characters. The attraction between the two of them is never actualized (they almost kiss but are interrupted). Keyshawn is also in an abusive relationship which Diamond seeks to rescue her from.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

**II. Comparison of Remaining Elements Reveals No Substantial Similarity**

The gun incident in question takes on completely different forms in the works. In *SKC*, Mike brings a gun to the cabaret to protect Brandy from Tyrone. He never uses it and quits his job in the aftermath of the incident. Diamond, however, pulls out his gun in a fight with Derek. The two of them scuffle and lose track of the weapon, which Keyshawn ultimately picks up for herself. She does not become disinterested in Diamond because he has a weapon. Instead, she uses the weapon herself to make him stop attacking Derek.

Plaintiff also alleges that both characters wear a necklace that references grandparents. This statement is a mischaracterization. While Mike does wear a necklace that reminds him of his grandmother, Diamond wears a necklace that contains a crystal given to him by a fellow service member in Iraq. He believes that the crystal has protective properties and gives it to Keyshawn to keep her safe.

Having evaluated these alleged similarities, the Court finds that no reasonable jury could find substantial similarity between the characters of Mike and Diamond.

**H. Sequence of Events & *Metcalf* Analysis**

Lastly, the Court evaluates the sequence of events. In many ways, this inquiry is duplicative of the analysis the Court has already performed in Sections IV-A, IV-B, IV-F, and IV-G. However, the Plaintiff has also raised an argument related to *Metcalf v. Bocho*, 294 F.3d 1069 (9th Cir. 2002), which is best addressed here. In *Metcalf*, the Ninth Circuit wrote that "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element. Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection." 294 F.3d at 1074. The Court has already analyzed many of Plaintiff's alleged substantial similarities and found them to be either unprotectible or not substantially similar. The question remains, however, whether *PV*

:

Initials of Preparer PMC

has so significantly duplicated *SKC*'s use of unprotectible elements to find substantial similarity under *Metcalf*.

The type of parallels required to find substantial similarity under this theory are best articulated by the facts of *Metcalf*:

> The similarities between the relevant works are striking: Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician. The totality of the similarities goes beyond the necessities of the theme and belies any claim of literary accident. The cumulative weight of these similarities allows the Metcalfs to survive summary judgment.

294 F.3d at 1073–74 (internal citations, quotations, and alterations omitted). Plaintiff's characterization of the similarities between the works arrangement of elements in beginning, middle, and end is plagued with mischaracterizations. Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. 14–17. A review of the Court's summaries of the respective plots, as offered in Sections II-B and II-C, demonstrates that the arrangement of the works in questions in no way approaches the level of similarity present in *Metcalf*. There are very significant differences in the ways that the works make use of unprotectible elements, as outlined throughout this opinion and, in particular, in many of its footnotes. "Many courts have been reluctant to expand this concept beyond the clear-cut case presented in *Metcalf*." *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1138 (C.D. Cal. 2007). For that reason, "[c]ourts have routinely rejected *Metcalf* claims over random similarities." *Id.* Presented with a list of random similarities and mischaracterizations, the Court rejects Plaintiff's *Metcalf* theory.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-02147-SVW-AGR | Date | December 7, 2023 |
| Title | *Nicole Gilbert-Daniels v. Lions Gate Ent. Corp. et al.* | | |

## VI. Conclusion

The Court has summarized the works in question and performed the test for substantial similarity on those works. That test required the Court to filter out unprotectible elements of the works and to compare the remaining protectible elements. Having done so, the Court finds that no reasonable jury could find substantial similarity between *SKC* and *PV*.

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment [ECF No. 68].

**IT IS SO ORDERED.**

:

Initials of Preparer PMC